UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BFI WASTE SYSTEMS OF NORTH )
AMERICA, LLC, )
)
     Plaintiff, )
)
    vs. ) Case No.  4:09CV1379 HEA
)
SHAW ENVIRONMENTAL & )
INFRASTRUCTURE, INC., et al., )
)
     Defendants. )

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant Shaw Environmental &

Infrastructure, Inc.'s Motion to Dismiss, [Doc. No. 24].  Plaintiff opposes the

Motion.  For the reasons set forth below, the Motion is granted.

## Facts and Background[1]

Plaintiff brought this action pursuant to Sections 107 and 113[2] of the

Comprehensive Environmental Response, Compensation and Liability Act of 1980

(CERCA), 42 U.S.C. §§ 9607 and 9613, as amended, the Declaratory Judgment

---

[1]  The following facts are taken from the Court's Opinion, Memorandum and Order dated
July 23, 2010, which, in turn were taken from Plaintiff's Complaint.  The Court has added
additional facts, taken from the Complaint, as are relevant to the instant motion.  As the Court
stated previously, the recitation of facts is set forth for the purposes of this motion only.  It in no
way relieves the parties of the necessary proof of the facts in these proceedings.

[2]  Plaintiff has voluntarily dismissed its Section 113 claim without prejudice.

Act, 28 U.S.C. § 2201, and Missouri law for the recovery of costs and other damages Plaintiff has allegedly incurred or will incur in connection with its landfill, the Missouri Pass Landfill, (the Site), located in Maryland Heights, Missouri.

The Complaint alleges the following facts:

The Site is a sanitary landfill located on a 99 acre parcel in Maryland Heights, Missouri. Approximately 72 acres of the Site were permitted for waste disposal. Plaintiff owns the Site. It received a permit from the Missouri Department of Natural Resources to operate the Site as a sanitary landfill. The Site stopped accepting waste in January, 1995 and received official closure approval from the State of Missouri in May, 1996. The Site is subject to a mandatory 30-year post-closure care period which began in May, 1996 and ends in May, 2026.

The Site has an active gas collection system that consists of landfill gas extraction wells, header and lateral tubing and piping, condensate knockout tanks, a blower system, active and passive flares, sumps and pumps, meters and metering equipment, and other related devices. The purpose of the gas collection system is, among other things, to prevent the migration of landfill gas.

On October 22, 2001, Plaintiff, Defendant MoPass and Defendant Biomass entered into a Landfill Gas Asset Purchase Agreement, (the Purchase Agreement).

Under the terms of the Purchase Agreement, MoPass agreed to purchase the Site's gas collection system and the rights to collect, use and sell landfill gas generated by the Site. As consideration for the assets that it acquired from Plaintiff, MoPass agreed that for the 20 year term of the Purchase Agreement, it would perform the required post-closure care for the Site including, but not limited to, monthly gas probe testing, final cover maintenance and the operation and maintenance of the Site's gas collection system. MoPass further agreed to pay $25,000 per year for easement and lease rights and to be responsible for any taxes levied against the gas collection system and other assets that it acquired from Plaintiff.

Paragraph 2.3 of the Purchase Agreement provides that MoPass is responsible for the active and passive abatement of any migration of landfill gas from the Landfill collection area. The Purchase Agreement requires MoPass to maintain the gas collections system in good operating condition and repair and to replace any components of the gas collection system that become inoperable or obsolete while it is responsible for operating the system.

Plaintiff and MoPass entered into a Site Lease Agreement, (the Site Lease), the same day as they executed the Purchase Agreement. In the Site Lease, Plaintiff gave MoPass the right to use a portion of the Site to generate electricity, produce high or medium Btu gas or collect, destroy, recycle, inject or treat condensate or

other liquids collected at the Site.  In exchange for the use of a portion of the Site, MoPass agreed to pay Plaintiff $25,000 per year in annual rent and to pay all property taxes levied on the Site.  The Site Lease has a 20 year term.  Plaintiff may terminate the Site Lease if the Purchase Agreement is terminated prematurely.

The Purchase Agreement requires MoPass to indemnify, defend and hold harmless Plaintiff against any losses, cost, expenses, claims, liabilities, actions, causes of actions, fines, penalties, remediation, or damages arising from MoPass' maintenance or operation of the gas collection system, activities at the Site, collection, use, sale, or flaring of landfill gas, or failure to comply with the terms of the Purchase Agreement or Site Lease.  Under the Purchase Agreement, MoPass must also defend, indemnify and hold harmless Plaintiff against any claims, losses, liability, damages, penalties, fines, costs and expenses due to the release, discharge or deposit of Hazardous Material by MoPass or its agents, contractors or employees at the Site and must take all measures necessary to remedy such releases, discharges and deposits.  This environmental indemnity provision expressly provides for indemnification for and against any and all emissions and migrations of landfill gas.

The Purchase Agreement provides that Defendant Biomass will act as a guarantor for MoPass and will guarantee timely payment and performance by

MoPass of its obligations under the Purchase Agreement, the Site Lease and all related agreements, including its obligation to indemnify Plaintiff. Biomass is obligated to take all actions necessary to ensure that MoPass does not default on the Purchase Agreement, the Site Lease or any related agreements, and is immediately liable if MoPass fails to perform as required under the agreements.

Defendant Liquid Solutions[3] constructed a facility to treat industrial wastewater and other liquids (the E-VAP facility) on the leased portion of the Site and began storing liquids at the Site without Plaintiff's approval.

On July 27, 2005, Plaintiff, MoPass, Biomass, and Liquid Solutions entered into a letter agreement in which Plaintiff granted a license to Liquid Solutions to operate and maintain the E-VAP facility at the Site (the License Agreement). The parties to the License Agreement also entered into a Joinder Agreement in which they agreed that Liquid Solutions would join MoPass as a lessee under the existing Site Agreement. Under the Terms of the License Agreement, Liquid Solutions agreed to be bound by the terms of the Purchase Agreement, as if it were a party thereto, until an amended Purchase Agreement and Site Lease could be negotiated.

---

[3] On March 1, 2010, a Suggestion of Bankruptcy and Notice of Stay was filed on behalf of Defendant Liquid Solutions, LLC. As such, the provisions of 11 U.S.C. § 362(a) apply and all claims, causes of action and proceedings commenced against Liquid Solutions, LLC are stayed. Therefore, the rulings herein shall have no effect at this time to the claims against Defendant Liquid Solutions, LLC.

An Amended Purchase Agreement and Site Lease were never executed, but Liquid Solutions nevertheless proceeded to operate the E-VAP facility on the leased portion of the Site. The License Agreement requires Liquid Solutions to indemnify, defend and hold harmless Plaintiff against any losses, costs, expenses, claims, liabilities, actions, causes of action, fines, penalties, remediation, or damages arising out of Liquid Solutions' construction and maintenance of the E-VAP facility, activities at the Site or failure to comply with the terms of the License Agreement or Site Lease. The License Agreement expired on November 8, 2006.

The Complaint further alleges that Liquid Solutions has no employees other than its president. It relied on Shaw Environmental & Infrastructure, Inc. (Shaw) to conduct post-closure care and other operations at the Site. Shaw employees performed all Site activities for Liquid Solutions and MoPass since August, 2005. Shaw employees operated and maintained the E-VAP facility. Shaw employees used Shaw equipment and vehicles. Their work included conducting monthly gas probe monitoring and operating and controlling the Site's gas collection system. Shaw managed, directed and conducted operations relating to the leakage or disposal of hazardous substances at and from the Site, and made decisions concerning compliance with environmental regulations.

During the time Shaw was operating the Site's gas collection system, evidence of gas migration was detected.

Defendants have informed Plaintiff that they do not intend to address actual or threatened gas migration from the Site. Plaintiff has retained a contractor to complete an investigation and to develop a work plan to contain and eliminate any gas migration.

The Complaint further alleges that through its Shaw LS subsidiary, Shaw helped to establish Liquid Solutions as a limited liability company. According to the Limited Liability Company Agreement for Liquid Solutions, the company had its principal place of business at Shaw's offices in Fenton, Missouri. Liquid Solutions held itself out as an independent, financially viable company, but it allegedly was actually controlled by and financially dependent upon Shaw. Officers from Shaw made decisions concerning the operation of Liquid Solutions and attended meetings on its behalf. Shaw failed to provide Liquid Solutions with sufficient capital to operate given its known and anticipated liabilities and expenses. Rather than providing Liquid Solutions with funding to operate independently, Shaw and/or its affiliates made loans to Liquid Solutions at high rates of interest. Liquid Solutions quickly became insolvent. Even after it became insolvent, Shaw continued to operate the Site through Liquid Solutions to avoid

liability for post-closure care, gas migration and other obligations that Liquid Solutions had assumed on its behalf.

GEI Liquid Solutions, LLC, (GEI), jointly owns Liquid Solutions with Shaw LS. GEI brought suit against Shaw LS in this Court on August 6, 2008 alleging that Shaw LS had breached the terms of their Limited Liability Company Agreement by asserting control over Liquid Solutions and operating it to enrich Shaw LS and its affiliates. Further, in its Complaint, GEI alleged Shaw (Shaw Environmental & Infrastructure, Inc and Shaw LS) would provide just enough financing to keep GEILS and GEII working, but did not fully fund Liquid Solution's or Environmental Solutions' requirements. This Complaint further alleged that Shaw LS's representative on the Mangagement Board and the then current president of Shaw Environmental and Infrastructure, Inc., and affiliate of Shaw threatened the Manager of the GEI entities that if GEILS did not accept the "offer", Shaw would force Liquid Solutions into bankruptcy and wipe out GEILS's equity interest in Liquid Solutions. The representative told the manager that Shaw and its management are experts in buying companies out of bankruptcy and that they would try to buy Liquid Solutions at a bankruptcy auction. Further, the Complaint alleges that the Complaint in the GEI suit alleged that Shaw has used its position on the Management Board of Liquid Solutions to favor its own interests

such as paying amounts due to Shaw for services Shaw provided to Liquid Solutions while ignoring invoices submitted for identical services provided by GEILS.

Finally, the Complaint alleges that "Liquid Solutions was operated and maintained as an alter ego of Shaw and was a fraudulent effort by Shaw to avoid liability for its involvement in the Site. The corporate veil of Liquid Solutions may be pierced, and Shaw may be found liable as if it were Liquid Solutions."

Count I of the Complaint is brought against Shaw, Shaw LS, Liquid Solutions and MoPass for costs incurred and future costs incurred while undertaking response actions under Section 107(a) of CERCA. This count alleges that Shaw, Shaw LS, Liquid Solutions, and MoPass each were an operator of the Site at the time of disposal of "hazardous substances." Further, during the time that these defendants operated the Site, there was a release or threatened release at the facility of hazardous substances. Plaintiff seeks recovery of the response costs.

Count II is brought against Shaw, Shaw LS, Liquid Solutions, and MoPass under a theory of negligence. This Count alleges that these defendants had a duty to maintain and repair the gas collection system and to operate the Site, the gas collection system and the E-VAP facility so as not to permit hazardous substances to enter the environment. Further, they had a duty to promptly respond to known

releases of contaminants in a manner that would prevent migration and comply with the applicable federal, state and local statues and regulations.

The Complaint alleges that Shaw, Shaw LS, Liquid Solutions and MoPass breached these duties by their negligent acts and omissions in operating, maintaining and controlling the Site, the gas collection system and the E-VAP facility, and by their failure to prevent and effectively investigate and address the release of contaminants at the Site.

Counts III and IV are brought against Shaw, Liquid Solutions and MoPass for breach of the Purchase Agreement and Site Lease, respectively.[4]

Count V is a claim for Indemnification against Shaw, Liquid Solutions and MoPass.[5]

Count VI is a breach of guaranty claim against Biomass.

## Discussion

When ruling on a motion to dismiss for failure to state a claim, the Court must take as true the alleged facts and determine whether they are sufficient to

---

[4] Shaw (and Liquid Solutions, see footnote 3 regarding Liquid Solutions) has filed a Motion to Dismiss the breach of contract claims in addition to the CERCA and negligence claims.  The issues raised with respect to the breach of contract claims will be addressed in a separate Opinion.

[5] Shaw (and Liquid Solutions, see footnote 3 regarding Liquid Solutions) has filed a Motion to Dismiss the indemnification claim in addition to the CERCA and negligence claims. The issues raised with respect to the indemnification claim will be addressed in a separate Opinion.

raise more than a speculative right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). The Court does not, however, accept as true any allegation that is a legal conclusion. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009). The complaint must have "'a short and plain statement of the claim showing that the [plaintiff] is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting Fed.R.Civ.P. 8(a)(2)) and then *Conley v. Gibson*, 355 U.S. 41, 47 (1957), abrogated by *Twombly*, supra); see also *Gregory v. Dillard's Inc.*, 565 F.3d 464, 473 (8th Cir.) (en banc), cert. denied, 130 S.Ct. 628 (2009). While detailed factual allegations are not necessary, a complaint that contains "labels and conclusions," and "a formulaic recitation of the elements of a cause of action" is not sufficient. *Twombly*, 550 U.S. at 555; accord *Iqbal*, 129 S.Ct. at 1949. The complaint must set forth "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; accord *Iqbal*, 129 S.Ct. at 1949; *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 629-30 (8th Cir.2010); *Zutz v. Nelson*, 601 F.3d 842, 848 (8th Cir. 2010); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. If the

claims are only conceivable, not plausible, the complaint must be dismissed. *Twombly*, 550 U.S. at 570; accord *Iqbal*, 129 S.Ct. at 1950.  In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594.  The issue in considering such a motion is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of the claim. See *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).

The relevant inquiry with respect to Shaw is whether Plaintiff has sufficiently alleged that Liquid Solutions should be deemed the alter ego of Shaw.

It is a general principle of corporate law "deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).  In certain instances, however, the alter ego doctrine allows for piercing the corporate veil so that liability can be placed on a parent corporation.  In *Blair v. Infineon Technologies, AG*, 2010 WL 2608959 (D.Del. 2010), the Court for the District of Delaware discussed and applied the applicable Delaware law[6]

---

[6]  The parties agree that Delaware law is applicable for the purposes of this analysis since Liquid Solutions is a Delaware corporation.

In order to succeed on an alter ego theory of liability, plaintiffs must essentially demonstrate that, in all aspects of the business, the [ ] corporations actually functioned as a single entity and should be treated as such." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir.2001). An alter ego relationship may arise where "a corporate parent exercises complete domination and control over its subsidiary." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 266 (D.Del.1989). Various jurisdictions apply slightly different alter ego tests, but one of the "most important differences [ ] seem[s] to reside largely in ... whether an element of fraudulent intent, inequitable conduct, or injustice is explicitly required [ ]." Pearson, 247 F.3d at 484 n. 2; see also *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1093 (1st Cir.1992) (requiring only that "the parent corporation ... acted in a blameworthy manner" for a finding of fraud in alter ego analysis); *Lumpkin v. Envirodyne Industries, Inc.*, 933 F.2d 449, 463 (7th Cir.1991) (requiring proof of fraud or injustice akin to intentional wrongdoing in its alter ego test). Whether or not the alter ego test requires an element of fraudulent intent "is demonstrably an inquiry into whether the ... corporation is little more than a legal fiction." *Pearson*, 247 F.3d at 485. This court has required an element of fraudulent intent in its alter ego test, as well as the traditional requirement that the corporation and its subsidiaries operated as a single economic entity (the "single entity test"). *Trevino v. Merscorp, Inc.*, 583 F.Supp.2d 521, 528 (D.Del.2008); see also *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, Civ. No. 04-1199, 2005 WL 851126, at *3 (D.Del. Apr.13, 2005). Under the single entity test, the Third Circuit has considered seven factors in determining whether a corporation operated as a single economic entity: (1) gross undercapitalization; (2) failure to observe corporate formalities; (3) non-payment of dividends; (4) insolvency of the debtor corporations at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) whether the corporation is merely a facade. *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir.1981) (approving the federal alter ego factors used by the 4th Circuit in *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 686-87 (1976)); see also *Trustees of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir.2003). While the list of factors is not

exhaustive and no single factor is dispositive, some combination is required, and an overall element of fraud, injustice, or unfairness must always be present. *Trevino*, 583 F.Supp.2d at 529 (citing *United States v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104 (D.Del.1988)).

*Blair v. Infineon Technologies AG*, 2010 WL 2608959, 6  (D.Del.,2010).

The question before the Court is not whether Plaintiff will ultimately succeed on the merits, rather, the Court must ascertain at this juncture whether Plaintiffs have sufficiently alleged facts to raise more than a speculative right to relief.  *Twombly*, 550 U.S. at 555-56.  Plaintiffs have alleged that Liquid Solutions is jointly owned by Shaw LS and GEI Liquid Solutions, LLC.  Pursuant to a written Limited Liability Company Agreement, Shaw LS and GEI are equal owners and have equal control of Liquid Solutions.  Shaw LS is a subsidiary of Shaw.

While Plaintiff alleges certain factors such as that the officers from Shaw made decisions concerning the operation of Liquid Solutions and attended meetings on its behalf; failed to provide sufficient capital to operate; and that Liquid Solutions quickly became insolvent, Plaintiff has failed to sufficiently allege that Shaw and Liquid Solutions operated as a single entity.  The Complaint appears to be inconsistent in its allegations.  Whereas, Plaintiff alleges that Shaw LS jointly owns Liquid Solutions with GEI, Plaintiff also alleges that Shaw failed to provide Liquid Solutions with sufficient capital.  Plaintiff does not allege how or

why it was incumbent on Shaw to provide capital to operate, and the two

propositions appear inconsistent. Moreover, while Plaintiff alleges Liquid

Solutions "quickly became insolvent," the salient question is whether Liquid

Solutions was insolvent when it was created. This cannot be inferred from

Plaintiff's allegations before the Court.

Likewise, Plaintiff's claim that Liquid Solutions was operated and

maintained as an alter ego of Shaw and was a fraudulent effort by Shaw to avoid

liability for its involvement in the Site is conclusory and fails to set out sufficient

facts to establish the necessary fraud or injustice.

> [T]he fraud or similar injustice that must be demonstrated in order to
> pierce a corporate veil under Delaware law must, in particular, "be
> found in the defendants' use of the corporate form." *[Mobile Linear
> Films, Inc.,* 718 F.Supp. 260,] 269 [(D.Del. 1989)]; *see also Wallace
> [v. Wood,]* 752 A.2d [1175,] 1184 [(Del.Ch.1999)]("Piercing the
> corporate veil ... 'requires that the corporate structure cause fraud or
> similar injustice' "); *Outokumpu [Engineering Enterprises, Inc. V.
> Kvaerner Enviropower, Inc.,]* 685 A.2d [724,] 729 [(Del.Super.Ct.
> 1996)](same); *Sears, Roebuck & Co. v. Sears plc,* 744 F.Supp. 1297,
> 1304-1305 (D.Del.1990) (same); *ACE & Co., Inc. v. Balfour Beatty
> PLC,* 148 F.Supp.2d 418, 425 (D.Del.2001) (same); *C.R. Bard,* 997
> F.Supp. at 559-560 (same); *Chaplake Holdings, Ltd. v. Chrysler
> Corp.,* 1995 WL 653510 at *4 (Del.Super.Ct.1995) (same); *In re
> Hillsborough Holdings Corp.,* 166 B.R. 461, 469 (Bankr.
> M.D.Fla.1994) (same, interpreting and applying Delaware law).
> Therefore, "[t]he underlying cause of action[, at least by itself,] does
> not supply the necessary fraud or injustice. To hold otherwise would
> render the fraud or injustice element meaningless, and would sanction
> bootstrapping." *Mobil Oil,* 718 F.Supp. at 268; *see also Outokumpu,*
> 685 A.2d at 729 ("The 'injustice' must be more than the breach of

contract alleged in the complaint"); *Sears,* 744 F.Supp. at 1305 ("Thus, the alleged fraud or inequity must be distinct from the tort alleged.

*In re Foxmeyer Corp.* 290 B.R. 229, 236 (Bkrtcy.D.Del.,2003)

## Conclusion

Plaintiff's Complaint fails to sufficiently set out the requisite allegations to state a claim against Shaw under an alter ego theory for piercing the corporate veil of Liquid Solutions. The allegations do not set out the basis upon which Defendant Shaw could respond to Plaintiff's claims that it should be held liable for actions taken by Liquid Solutions, which is jointly owned by Shaw LS and GEI. Furthermore, the allegations of a fraudulent effort to avoid liability for its involvement in the Site fails to satisfy the necessary pleading requirements under *Twombly* and *Iqbal.*

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss, [Doc. No. 24], is **GRANTED**.

**IT IS FURTHER ORDERED** that the claims against Shaw Environmental & Infrastructure, Inc. are dismissed. Plaintiff may file a motion to amend within 14 days from the date of this Opinion, Memorandum and Order for the Court's consideration.

Dated this 30th day of July, 2010.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE